Filed 1/27/26  EBO Properties North v. Sirott CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| EBO PROPERTIES NORTH, LLC, Plaintiff and Appellant, v. MATTHEW N. SIROTT, et al., Defendants and Respondents. | A169638 (Contra Costa County Super. Ct. No. MSC17-00404) |
| BIMAL PATEL, et al., Plaintiffs and Respondents, v. MATTHEW N. SIROTT, et al., Defendants and Appellants. | A171754 (Contra Costa County Super. Ct. No. MSC17-00404) |

We again address a heavily litigated business dispute involving a group of medical doctors and associated entities.[1]  Close to a decade ago, Bimal Patel, John Ganey, and EBO Properties North LLC (EBO) (owned equally by Patel and Ganey) sued Matthew N. Sirott, Arlene Sirott, and Robert Robles after 400 Taylor Holdings, LLC (Taylor Holdings)—a limited liability company in which all parties held an interest—declined to lease space in a

---

[1]  The record on appeal exceeds 7,000 pages in length.

1

building it owned to East Bay Medical Oncology/Hematology Medical Associates, Inc., a medical practice to which both Patel and Ganey belonged. The claims at issue here are derivative claims asserted by EBO, alleging Matthew Sirott (Sirott) and Robles breached fiduciary duties they owed Taylor Holdings in refusing to approve the lease.[2]

After years of procedural skirmishes, Sirott, Arlene Sirott, and Robles (defendants) eventually interposed a demurrer to EBO's derivative claims on the ground it lacked standing to pursue them under Corporations Code section 17709.02.[3]  Specifically, defendants maintained EBO had relinquished its interest in Taylor Holdings during the litigation and thus no longer met the "continuous" ownership requirement for bringing derivative claims.  The trial court ruled that even if that were the case, it had statutory discretion to allow EBO to proceed.[4]

Defendants sought writ review, which we granted.  In a partially published opinion, *Sirott v. Superior Court* (2022) 78 Cal.App.5th 371 (*Sirott*), we first concluded the *continuous* ownership requirement that applies to corporate shareholders seeking to bring derivative claims also applies to members of limited liability companies.  (*Id.* at pp. 381–382.)  We next concluded the statutory criteria that may excuse the *contemporaneous*

---

[2]  Although Patel and Ganey have, during the litigation, attempted to assert individual claims, they did not file notices of appeal from the judgment at issue and thus did not preserve challenges to adverse rulings on those claims.

[3]  All statutory references are to the Corporations Code unless otherwise specified.

[4]  The gist of the derivative claims is that Sirott, in refusing to agree to the lease urged by Patel and Ganey, placed his personal economic interests in other potential lessees of the building above the economic interests of Taylor Holdings and thus breached fiduciary obligations owed to the LLC.

2

ownership requirement, also set forth in section 17709.02, do not apply to the *continuous* ownership requirement. We lastly concluded, however, that equitable considerations may permit an exception to the *continuous* ownership requirement. (*Sirott,* at pp. 383–385.) We therefore reversed and remanded for further proceedings. (*Id.* at p. 385.)

On remand, and after further procedural skirmishes, plaintiffs eventually filed a fifth amended complaint. Defendants answered and thereafter filed a summary judgment motion asserting no equitable considerations exist sufficient to allow EBO to maintain the derivative claims. The trial court granted the motion, and EBO appealed. We again reverse, concluding the record here compels the conclusion the continuous ownership requirement should be equitably relaxed, allowing EBO to proceed with the derivative claims.

## BACKGROUND

### *The Parties*

Patel, Ganey, Sirott, and Robles are medical doctors. In 2007, Patel and Sirott formed Taylor Holdings, in which they each had a 50 percent interest. Taylor was at the time, and until 2019, the sole owner of a Pleasant Hill office building (medical building) in which Patel, Ganey, Sirott, and Robles practiced.

Patel and Ganey belong to the same medical practice, East Bay Medical Oncology/Hematology Medical Associates, Inc. (EBMOH). They are also members of EBO, each holding a 50 percent membership interest.

Sirott and Robles belong to another medical practice, Diablo Valley Oncology and Hematology Group (DVO).

In 2008, Patel, Sirott, and Robles executed an operating agreement, listing Taylor Holdings' members as EBO (50 percent), Sirott (25 percent),

and Robles (25 percent). The following year, Sirott transferred his 25 percent interest in Taylor Holdings to his family trust, for which his wife Arlene Sirott is a co-trustee. The transfer was made through a first amendment to the Taylor Holdings operating agreement.

In the fall of 2016, Patel proposed to Taylor Holdings and Sirott that Patel's practice, EBMOH, lease a vacant space in the medical building. Sirott "refused to entertain the proposal," voicing concern that the proposed lease would "disadvantage[] another tenant, . . . the California Radiation Treatment Center, LLC" (CRTC) which was owned by Sirott, Robles, and EBMOH. EBMOH "was forced to seek other space for its venture," and the vacant space was eventually leased to Sirott and Robles' practice, DVO, allegedly on less advantageous terms.

### Litigation Prior to Writ Proceedings

Patel, Ganey, and EBO (plaintiffs) sued defendants in March 2017, asserting breach of fiduciary duty and other claims related to the defendants' refusal to lease the vacant space in the medical building to EBMOH. The following month, the three filed a first amended complaint, adding EBO as a derivative plaintiff asserting claims on behalf of nominal defendant Taylor Holdings and adding a cause of action for reformation based on an alleged mistake made in the first amendment to Taylor's operating agreement. As to the latter claim, plaintiffs alleged the first amendment to the operating agreement erroneously listed EBMOH, rather than EBO, as the holder of the 50 percent ownership interest in the limited liability company. Defendants interposed a demurrer which the trial court sustained in part and overruled in part.

Approximately six months later, in October, Patel, Ganey, and EBO filed a second amended complaint. They again alleged individual claims, as

4

well as derivative claims by EBO on behalf of Taylor Holdings. Defendants again demurred, and the trial court again sustained the demurrer in part and overruled it in part. Specifically, the court dismissed Ganey's individual claims for lack of standing on the ground Ganey had never been a member of Taylor Holdings, nor was he a signatory of the first amendment to the operating agreement for which reformation was sought. The court also dismissed Arlene Sirott and Robles from all causes of action except for reformation.

In March 2018, Sirott filed a cross-complaint against Patel, alleging competing derivative claims on behalf of Taylor Holdings for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, gross negligence, and constructive fraud based on Patel's alleged rejection of a competing lease proposal whereby CRTC would lease the vacant space in the medical building so it could construct and operate a Cyberknife on the premises. This refusal allegedly caused Taylor to "lose approximately the same amount of money" that Patel alleged in his complaint could have been earned from the EBMOH lease. The trial court eventually dismissed Sirott's second amended cross-complaint without leave to amend on the ground he failed to allege the CRTC lease proposal had actually been presented to Taylor Holdings for Patel's consideration.

### The Reformation Trial

The following year, in May 2019, the trial court held a bifurcated trial on the reformation claim, the specific issue being whether EBO or EBMOH was the owner of the 50 percent ownership interest in Taylor Holdings. In its statement of decision, the court remarked the parties had been "astonishingly sloppy with respect to the written agreements setting forth the parameters of

5

their business relationship," which had led, in part, to the "high conflict between the parties and to this protracted litigation."

After considering "lengthy briefings" and argument—and exhaustively detailing the numerous relevant transactions involving Taylor Holdings and related individuals and entities—the court found EBO was the rightful owner of the 50 percent interest in Taylor. Specifically, the court found credible Patel's testimony that he signed the first amendment to the Taylor Holdings operating agreement at Sirott's request only for the purpose of allowing Sirott to transfer his interest to his family trust and never intending to transfer EBO's 50 percent stake in Taylor to EBMOH. In contrast—given Sirott's intimate involvement in the drafting of the numerous relevant agreements he then executed—the court found not credible his testimony that he had forgotten the transfer of Patel's 50 percent share to EBO and did not believe EBO was the appropriate owner. The court also found not credible Robles's "repeated testimony that he 'believed' that EBMOH was the true owner" of the 50 percent share in Taylor Holdings. The court additionally found Sirott and Robles not credible in other aspects of their testimony, and it found Patel had not been credible at an earlier stage in the litigation. It therefore admonished the parties and attorneys "going forward in this and in all related litigation before this Court, to be truthful in all testimony and representations."

During the reformation trial, the parties became aware the original amended and restated operating agreement for Taylor Holdings (the precursor to the first amendment at issue) was missing two pages, which were included in another version of the agreement admitted as an exhibit. After the court issued its tentative opinion, Patel and EBO asked it to additionally find that the amended and restated operating agreement

6

included the two pages from the other exhibit.  The court declined to do so, stating if the parties could not reach agreement on the issue, Patel and EBO would need to amend their complaint to include a cause of action for declaratory relief seeking such a finding.

### *The Transfer Agreements*

In June 2019—after the conclusion of evidence in the reformation trial but before the trial court issued its decision—the parties considered an offer to sell the medical building.  For tax purposes, the parties entered into a series of prefatory agreements.  EBO asserts defendants' attorney insisted on these arrangements, pointing to a 2019 e-mail from the attorney stating, "As we discussed, the problem this poses relates to *the need* to drop ownership of the [medical building] down to its members to accomplish the 1031 treatment Dr. Sirott and Dr. Robles *require* in order to proceed with the sale. . . . [A]ssuming a sale will occur before the litigation is resolved . . . it seems to me the solution to this problem would be as follows: (1) EBMOH would enter into an agreement with [EBO] (and/or its members) under which EBMOH disclaims any interest in [Taylor Holdings] (as well as the proceeds from a sale of the [medical building]), with the understanding that Dr. Sirott and Dr. Robles will be acting in reliance on this agreement and there will be satisfactory evidence that the shareholders of EBMOH have approved the agreement; and (2) [EBO] and its members and Dr. Sirott and Dr. Robles would enter into a separate agreement allowing title to [the medical building] to be dropped down to [EBO's] members (Dr. Patel and Dr. Ganey) and the undisputed members of [Taylor Holdings], with the understanding that this is solely to accommodate a sale and will in no way prejudice the position of the parties in the pending litigation."  (Italics added.)

In line with this suggestion, EBO and EBMOH entered into a disclaimer agreement whereby EBMOH expressly disclaimed any membership interest in Taylor Holdings and any right to proceeds from the sale of the medical building.  The disclaimer agreement was made "subject to" another agreement (agreement regarding Taylor Holdings, referred to here as the "No Prejudice Agreement"), and recites that it and the No Prejudice Agreement were "being entered into by the parties . . . to facilitate transfer of the member interests to tenancy in common ownership and to facilitate the sale of the [medical building]."

In addition, Patel, Ganey, and EBO entered into a distribution agreement (EBO Distribution Agreement) pursuant to which EBO transferred its 50 percent membership interest in Taylor Holdings to Patel (25 percent) and Ganey (25 percent) as individuals.  The EBO Distribution Agreement states it was created because the members of Taylor Holdings and the members of EBO "determined" it was in their "individual and collective best interests" to distribute 25 percent undivided interests in the medical building to Patel, Ganey, Sirott, and Robles in order to establish a tenancy in common relationship among the four men with respect to ownership of the building.  The agreement provided EBO was not thereby dissolved.  The effectiveness of the EBO Distribution Agreement was expressly conditioned upon receiving signed written consents from Taylor Holdings and the "adoption" of the agreement by all of the parties to another distribution agreement, this one for Taylor Holdings (Taylor Distribution Agreement).  Consents "to the transfers" were thus executed by Sirott individually, as a co-trustee of his family trust, and as a manager of Taylor Holdings.  Robles also executed an individual consent.  (Underscoring omitted.)

8

At the same time, Patel, Ganey, the Sirotts (individually and as co-trustees of their family trust), and Robles entered into the Taylor Distribution Agreement under which Taylor Holdings distributed its 100 percent interest in the medical building equally to Patel, Ganey, the Sirott family trust, and Robles as tenants in common. The agreement provided that Taylor was not thereby dissolved. The Taylor Distribution Agreement was expressly contingent upon "adoption by EBO and its members of the EBO Distribution Agreement."

The parties also executed a tenancy in common agreement (TIC Agreement) to manage the medical building between the distribution of the medical building out of Taylor Holdings and the sale of the building.

### *The No Prejudice Agreement*

Finally, and as is particularly relevant here, the parties executed the No Prejudice Agreement referenced above, which recognized that a dispute had arisen regarding whether the 50 percent membership interest in Taylor Holdings was owned by EBO or EBMOH, leading to the pending reformation claim. The agreement further recited that the members and "alleged" members of Taylor Holdings had "determined that it is in their interests" to transfer title to the medical building from Taylor to Patel, Ganey, the Sirott trustees, and Robles as tenants-in-common so they could, "in the future[,] transfer the [medical building] in a 1031 exchange." The No Prejudice Agreement states it is being entered into so the parties can "move forward with the vesting of title to the [medical building] in the names of the Sirott Trustees, Robles, Patel, and Ganey, as tenants-in-common . . . without prejudicing any of their rights, defenses and interests in conjunction with [this pending litigation]."

9

To this end, the No Prejudice Agreement provides, in relevant part, that it, the Taylor Distribution Agreement, and "any other instruments or agreements pertaining to a conveyance of the [medical building] (the 'Related Agreements'), will not prejudice any Party with respect to any claims or defenses such Party may have (or claim to have) in conjunction with [this litigation], with all Parties reserving all rights and remedies in conjunction with [this litigation], notwithstanding the execution of this Agreement, the TIC Agreement, the Disclaimer Agreement and the Related Agreements. The TIC Agreement, the Disclaimer Agreement, and any Related Agreements are hereby incorporated into this Agreement by reference for purposes of specifically defining what is the subject matter of this Agreement."

The No Prejudice Agreement further provides: "The Parties expressly and affirmatively agree that this Agreement, the TIC Agreement, the Disclaimer Agreement, and the Related Agreements, and any action taken pursuant to the foregoing agreements, will not be admissible in [this litigation]. The Parties shall instruct their counsel, representatives, and witnesses of this Agreement and their obligation to comply with it. Notwithstanding the foregoing, in the event the [medical building] is sold by the Parties before the conclusion of [this litigation], the fact of the sale (including the identity of the purchaser and the sale price) will be the only admissible information regarding the transaction, unless otherwise agreed to by the Parties in writing." In addition, "In the event there is a breach of this Agreement, the non-breaching party shall have the right to disclose this Agreement to the Court and seek sanctions as the Court deems appropriate for the breach of this Agreement."

For purposes of the No Prejudice Agreement, " 'Parties' " was defined as "the undersigned"—i.e., the signatories to the agreement. These included

10

Patel, Ganey, the Sirotts (individually and as co-trustees of their family trust), Robles, and EBO. The two attorneys representing the parties executed approvals as to the No Prejudice Agreement's form and content.

In sum, after the execution of this panoply of related agreements, Patel, Ganey, Sirott's family trust, and Robles each held a 25 percent membership interest in Taylor Holdings, and EBO held no interest in it. In addition, Patel, Ganey, Sirott's family trust, and Robles each held a 25 percent interest in the medical building as tenants in common. In September 2019, the medical building was sold to a third party.

### Third Amended Complaint

A year and a half later, in April 2021, Patel and EBO moved for leave to file a third amended complaint. As is relevant here, they sought to add Patel and Ganey as "individual" plaintiffs "as the damage they suffered was not incidental to the injury suffered by . . . Taylor LLC after they each received a 25% interest in . . . Taylor LLC and thereafter a 25% interest in the [medical building] in 2019 and therefore succeeded to the right to sue *individually and derivatively* on behalf of . . . Taylor LLC." (Italics added.) Specifically, the proposed third amended complaint included the following language: "Plaintiff EBO brings this action individually and derivatively in the right of and for the benefit of . . . Taylor LLC up until 2019. Thereafter, Plaintiffs Dr. Patel and Dr. Ganey became the individual members of . . . Taylor LLC by virtue of a transfer of interest from EBO in preparation for the sale of the [medical building]. As such, they succeeded EBO in the right to bring this action." (Underscoring omitted.) EBO and Patel also sought to add a new cause of action for declaratory relief involving the missing pages of Taylor LLC's amended and restated operating agreement.

11

Defendants opposed amendment, asserting there had been no agreement that any membership interest in Taylor Holdings or ownership of its derivative claims would be transferred in conjunction with the building's sale. Defendants also argued Patel, Ganey, and EBO could not sue individually because the alleged damages claims could "only be brought derivatively on [Taylor Holdings'] behalf." (Boldface omitted.) Their supporting documentation included prehearing correspondence between the parties wherein defendants maintained the proposed amendments violated the No Prejudice Agreement by disclosing too much information regarding the sale of the medical building and stated they would seek sanctions for breach of the agreement. It also included a declaration by Sirott attaching the No Prejudice Agreement in its entirety, wherein he averred he had "never signed any agreement authorizing EBO to transfer its membership interest in Taylor [LLC] to Dr. Patel and Dr. Ganey." Sirott subsequently acknowledged this was, in fact, not true, claiming he made an "honest mistake" and "didn't remember signing any agreement for EBO to transfer its membership interest in Taylor [Holdings] to Dr. Patel and Dr. Ganey."

Two months later, in June, the trial court granted Patel and EBO's motion in part, permitting them to amend the complaint to seek declaratory relief and revise the allegations in the reformation cause of action to reflect the court's decision following the bifurcated trial. The court denied the motion "as to modifying [their] damage claims from derivative to individual claims of Dr. Patel and Dr. Ganey." "The gravamen of the wrong," said the court, was "Dr. Sirott's breach of duties to Taylor LLC, which is a derivative claim," and plaintiffs had not "alleged facts that show Patel and Ganey suffered harm different from that suffered by the LLC." Plaintiffs thereupon filed a third amended complaint which continued to assert derivative claims

12

by EBO on behalf of Taylor LLC for breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and gross negligence, along with a new claim for declaratory relief.

Defendants again interposed a demurer. With respect to the derivative claims, they maintained EBO lacked standing to pursue them because it was no longer a member of Taylor Holdings—i.e., it could not meet the *continuous* ownership requirement set forth in section 17709.02. They also asserted Patel lacked standing to assert the claims because he was not " 'a member of record, or beneficiary,' " of Taylor " 'at the time of the transaction or any part of the transaction' " at issue—i.e., he could not establish the statutory *contemporaneous* ownership requirement.[5] As to the declaratory relief cause of action, defendants claimed there was no actual controversy to support such relief.

The trial court overruled the demurrer as to the claim for declaratory relief and continued the hearing as to the derivative claims to permit Patel and EBO to file a motion for standing under section 17709.02, subdivision (a)(1). They did so, asserting EBO met the statutory requirements for the court to exercise its discretion to allow EBO to proceed. They candidly noted, however, the law in this area was unsettled. They also urged that defendants be foreclosed from challenging their standing given the No Prejudice Agreement. Alternatively, they suggested either Patel or Ganey could be found to have standing based on their 2019 receipt of EBO's transferred interest or, as a further alternative, the court could permit the two to bring

---

[5] We note that while the asserted ground for EBO's lack of standing arose in the Spring and Summer of 2019 when numerous agreements were executed in conjunction with the sale of the medical office building, defendants did not raise the issue until two years later, in the Spring and Summer of 2021, in their opposition to plaintiffs' third amended complaint.

13

individual claims.  Their bottom line was that it would be inequitable for the court to rule that no party had standing to pursue the derivative claims.

The trial court granted Patel and EBO's motion for standing in part, allowing EBO to maintain the derivative claims.  It also sustained defendants' demurrer without leave to amend as to Patel but overruled it as to EBO.

### Writ Proceedings

Defendants sought writ relief, challenging the trial court's orders on their demurrer and plaintiffs' motion for standing.  We agreed the court erred in connection with both.

We first held the continuous ownership requirement that applies to corporate shareholders seeking to bring derivative claims also applies to members of limited liability companies.  We also held the statutory equitable provision on which the trial court relied to allow EBO to proceed pertains to the contemporaneous, rather than the continuous, ownership requirement. (*Sirott*, *supra*, 78 Cal.App.5th at pp. 381–385.)  We further recognized, however, that equitable considerations can provide an exception to the continuous ownership requirement.  (*Id*. at p. 385.)  We therefore declined to issue a writ directing that EBO's derivative claims be dismissed with prejudice.  Rather, we directed the trial court to determine whether EBO's derivative claims should be dismissed with or without prejudice, expressing no opinion as to whether Patel and EBO could make a sufficient equitable showing to allow EBO to proceed.  (*Ibid*.)

### Amendments to the Complaint on Remand

On returning to the trial court, the parties filed briefing as to whether the court should allow EBO and Patel to amend.

14

EBO and Patel urged that leave to amend should be granted for equitable reasons based on the parties' execution of the No Prejudice Agreement, EBO's reliance on that agreement, and defendants subsequent breach of it. Alternatively, they suggested they could be deemed proper derivative plaintiffs based on their beneficial interest in Taylor Holdings through their 50/50 membership interests in EBO at the time of the complained of transaction (contemporaneous ownership) which later became direct interests in Taylor (continuous ownership). Patel, Ganey, and EBO also sought to add a breach of contract claim based on defendants' asserted breach of the No Prejudice Agreement.

Defendants argued their demurrer to EBO's derivative claims should be sustained without leave to amend because EBO could not show it had been "fraudulently" deprived of its interest in Taylor Holdings. As defendants saw it, EBO voluntarily gave up its interest in the limited liability company in connection with the sale of the medical building. They asserted the No Prejudice Agreement was irrelevant as it did not cover the EBO Distribution Agreement and, regardless, subject matter jurisdiction could not be conferred by consent.

The trial court granted leave to amend as to EBO only, allowing it to attempt to allege an equitable basis to proceed. In doing so, the court noted that, while Patel, Ganey and EBO had not "alleged fraud on the part of Defendants, the equitable considerations are not limited to fraud only" as illustrated by *Haro v. Ibarra* (2009) 180 Cal.App.4th 823 (*Haro*). Thereafter, Patel, Ganey, and EBO filed their fourth amended complaint.

Defendants again demurred and filed a motion to strike. Citing our opinion in *Sirott*, they claimed we "directed [the trial court] to determine in the first instance whether plaintiffs could amend their complaint to 'allege

15

that defendants engaged in any wrongdoing involving EBO's distribution of its interest in Taylor LLC to [plaintiffs] Patel and Ganey.' "[6]  Since the fourth amended complaint "fail[ed] to allege any such wrongdoing," they argued, it should be dismissed with prejudice.  Defendants further argued the declaratory relief claim should be dismissed because EBO was not a signatory to the Taylor Holdings operating agreement for which declaratory relief was sought.

The trial court overruled defendants' demurrer, ruling that although EBO voluntarily relinquished its membership in Taylor Holdings, it alleged it did so in reliance on defendants' deceitful promises that the transfer would not affect any party's rights in regards to the litigation.  Defendants filed another writ petition challenging this ruling which we denied on numerous grounds, including defendants' failure to demonstrate that they lacked an adequate remedy at law.  The trial court granted, in part, the defendant's motion to strike.

Thus, a fifth amended complaint, filed in February 2023, became the operative complaint.

### *Fifth Amended Complaint*

The fifth amended complaint alleged the same six causes of action previously at issue.  The first, for reformation, reflected the court's bifurcated

---

[6]  This is a misstatement of our holding.  While we mentioned that the third amended complaint did not allege "defendants engaged in any wrongdoing involving EBO's distribution of its interest in Taylor LLC to Patel and Ganey" (*Sirott, supra*, 78 Cal.App.5th at p. 385), we went on to say that "*none of their concerns* are sufficiently established on this record to warrant an exception to the continuous membership requirement" (*ibid.*, italics added), and given the state of the record, "the trial court shall determine in the first instance *whether to dismiss EBO's derivative claims* with or without prejudice." (*Ibid.,* italics added.)  The court's mandate on remand was thus not as narrow as defendants claimed.

rulings on that claim. The second through fifth causes of action—for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and gross negligence—were brought derivatively by EBO on behalf of Taylor Holdings. The sixth cause of action sought declaratory relief to clarify the contents of Taylor's final operating agreement.

As is relevant here, the complaint alleged that, prior to the sale of the medical building, defendants' attorney insisted that the building's ownership be transferred equally to the four doctors individually as tenants in common, so Sirott and Robles could take advantage of a specific tax benefit upon its sale. To accomplish this goal, the parties executed a variety of agreements related to reorganizing the ownership of the medical building. Prior to the execution of these documents, the parties executed the No Prejudice Agreement, whereby they averred that the agreements pertaining to the reorganization of the ownership interests and conveyance of the medical building would not prejudice any party with respect to any claims or defenses such party might have in conjunction with this litigation. Despite these arrangements, and contrary to the terms of the No Prejudice Agreement, defendants opposed plaintiffs' motion for leave to file a third amended complaint in May 2021, attaching the No Prejudice Agreement to their opposition and arguing that, as a result of the associated documents, EBO no longer had standing to pursue the litigation.

The complaint further asserted "[i]t would be inequitable if EBO were not allowed to continue as the derivative plaintiff in this action, on behalf of [Taylor Holdings]. EBO is in the position it is today due to promises made to it and its members, Dr. Patel and Dr. Ganey, that no prejudice would come to any of them if they agreed to the reorganization of . . . Taylor LLC as demanded by Defendants' attorney so that Defendants could take advantage

17

of a lucrative tax benefit." In addition, "it would be inequitable if EBO were not allowed to continue as the derivative plaintiff in this action, as it would also mean that Dr. Sirott would not have to answer for his wrongdoing . . . and the damages he caused . . . Taylor LLC and its members. He and the other Defendants would be allowed to escape justice by deceptively inducing EBO into believing that the . . . Taylor LLC reorganization would have no impact on its right to pursue this action, and then breaching that very agreement without consequences or atonement."

### *Motion for Summary Judgment*

Five months later, defendants moved for summary judgment. They again asserted EBO had voluntarily relinquished its membership interest in Taylor Holdings, without any wrongdoing by defendants and therefore lacked standing to pursue the derivative claims because it could not meet the continuous ownership requirement to advance such claims. They also maintained the sixth cause of action for declaratory relief was barred because they had offered to unconditionally stipulate to the amendment to the Taylor operating agreement, thereby eliminating any actual controversy.

In support of their motion, defendants filed a separate statement of undisputed material facts, including that "[t]he Sirott Trustees, Robles, and their attorneys [did] not ask for and play[ed] no role in the decision by EBO, Patel, and Ganey to engage [the attorney involved in the tax-based reorganization] separately to convert EBO's indirect interest in the Medical Building to separate tenancies in common for Patel and Ganey." They further claimed their personal attorney never made "any statement insisting that EBO transfer its indirect interest in the Medical Building to Patel and Ganey." Rather, it made no difference to defendants.

18

They further maintained that various parties entered into the Disclaimer Agreement, the EBO Distribution Agreement, the No Prejudice Agreement, the TIC Agreement, and the Taylor Distribution Agreement "[t]o transfer and later sell the Medical Building." The stated purpose of the provisions in the No Prejudice Agreement regarding inadmissibility of the multiple agreements in this litigation "was to prevent the sale of the building from affecting Judge Austin's decision about whether EBO or EBMOH [held] the 50% membership interest in Taylor for the trial of the reformation claim." Defendants assertedly made "no representations to EBO, Patel, or Ganey about the effect of any of the transaction documents on EBO's ability to maintain derivative claims" and expected "EBO, Patel, and Ganey to rely on their own lawyers for advice about their rights in the litigation as well as the sale of the Medical Building." Defendants' litigation attorneys were assertedly unaware of the EBO Distribution Agreement until June 2021, when Patel and Ganey sought to file the third amended complaint.

EBO took issue with many of defendants' asserted material facts, supplied additional facts of its own, and argued that the existence of numerous factual disputes—such as "the meaning and impact of agreements that were entered into by the parties, the intent of the parties when they entered those agreements, as well as EBO's reasonable reliance on Defendants' promises made therein"—made summary judgment improper. In support of its opposition, one of EBO's litigation attorneys declared that he and another of EBO's attorneys had "multiple telephone conversations with Charles Seaman and Philip Borowsky [defendants' attorneys] regarding how the sale could be structured to accommodate the demands of the parties, without prejudicing any of the parties claims or defenses in the pending litigation." He further declared that he participated in drafting the No

19

Prejudice Agreement with Seaman and did "not believe that during the calls [they] ever discussed limiting the [No Prejudice] Agreement to the [r]eformation portion of the action. If that had been the intent, [he] would have had the Agreement clearly reflect that limitation." Both Patel and Ganey declared they would not have arranged for EBO to distribute its interest in Taylor Holdings to them had they believed it would negatively impact their claims in this litigation. They relied on the promises made in the No Prejudice Agreement when doing so.

The trial court disagreed and granted the motion. In its written order, the court stated, "To show standing, EBO had to allege facts showing that 'equitable considerations may warrant an exception to the continuous ownership requirement.' In other words, [EBO] had to allege some facts showing Defendants engaged in wrongdoing involving EBO's distribution of its interest in [Taylor Holdings] to Patel and former plaintiff Ganey." But EBO had not done so. In short, while the allegations of wrongdoing set forth in the Fifth Amended Complaint were sufficient to survive a demurrer, EBO had not presented evidence that Sirott never intended to abide by his obligations under the No Prejudice Agreement at the time he executed it— that is, there was no evidence Sirott committed promissory fraud. It also appeared to the court EBO was the first party to put the No Prejudice Agreement in front of **it** and, worse, EBO was taking the position "the No Prejudice Agreement was an agreement to decline to raise the issue of standing to the Court. However, lack of standing," said the court, "is jurisdictional. [Citation.] Standing cannot be conferred (or withdrawn) merely by parties' agreement. As a consequence, raising the issue of standing, alone, is not evidence of wrongdoing." EBO appealed.

20

*Attorney Fees*

Defendants subsequently filed a memorandum of costs for $59,222.59 as the prevailing parties. EBO filed a competing memorandum for $16,638 as the prevailing party in the reformation trial, also noting it had prevailed on Sirott's cross-action. Both parties additionally moved for contractual attorney fees, costs, and expenses under the Taylor Holdings amended and restated operating agreement on similar grounds. Defendants requested $1,466,157.78. EBO requested $848,251.25 plus costs of $82,109.16.

The court (a) denied both sides' requests for contractual attorney fees, finding there was no prevailing party under Civil Code section 1717; (b) granted defendants' request to strike plaintiffs' memorandum of costs on the ground they were not the prevailing party for purposes of Code of Civil Procedure section 1032; and (c) granted, in part, plaintiffs' request to strike defendants' memorandum of costs on the ground that, while defendants were the prevailing party for purposes of costs, certain of their claimed costs were not recoverable. The court went on to observe, "It turns out that the results of this case are highly unimpressive for either side—certainly nothing commensurate with the vast amounts of money, time, and effort devoted to the case by all parties." The court further commented that the reformation action—the "single affirmative claim by any party [that] ever resulted in a win for the complaining party"—ended up having no substantive importance after EBO lost its standing to assert the derivative claims. In short, the parties "fought to an expensive draw, and neither of them got anything substantive out of the litigation." Defendants appealed from the order denying contractual attorney fees (No. A171754).[7]

---

[7] We subsequently ordered the two appeals consolidated for purposes of argument and decision.

**DISCUSSION**

***Limited Liability Companies and Derivative Suits***

" ' "A limited liability company is a hybrid business entity formed under the Corporations Code and consisting of at least two 'members' [citation] who own membership interests [citation]. The company has a legal existence separate from its members. Its form provides members with limited liability to the same extent enjoyed by corporate shareholders [citation], but permits the members to actively participate in the management and control of the company." ' " (*Sirott*, *supra*, 78 Cal.App.5th at p. 381; see generally § 17701.01 et seq.)

"A corporation is a legal entity distinct from its shareholders. [Citation.] 'Because a corporation exists as a separate legal entity, the shareholders have no direct cause of action or right of recovery against those who have harmed it. The shareholders may, however, bring a derivative suit to enforce the corporation's rights and redress its injuries when the board of directors fails or refuses to do so.' " (*Norman v. Strateman* (2025) 112 Cal.App.5th 92, 100 (*Strateman*), quoting, *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108 (*Grosset*).) Generally, "[t]he principles governing derivative actions in the context of corporations apply to limited liability companies." (*Schrage v. Schrage* (2021) 69 Cal.App.5th 126, 150 (*Schrage*).)

For example, as is particularly relevant here, in *Grosset*, *supra*, 42 Cal.4th 1100, the Supreme Court held under California law a former corporate shareholder lacked standing to continue litigating a derivative action because he no longer owned stock in the corporation. (*Id.* at p. 1104.) In adopting this *continuous* membership requirement, the court reasoned: "Because a derivative claim does not belong to the stockholder asserting it, standing to maintain such a claim is justified only by the stockholder

22

relationship and the indirect benefits made possible thereby, which furnish the stockholder with an interest and incentive to seek redress for injury to the corporation. [Citations.] Once this relationship ceases to exist, the derivative plaintiff lacks standing because he or she 'no longer has a financial interest in any recovery pursued for the benefit of the corporation.' " (*Id.* at p. 1114)

The *Grosset* court further stated: "Although equitable considerations may warrant an exception to the continuous ownership requirement if the merger itself is used to wrongfully deprive the plaintiff of standing, or if the merger is merely a reorganization that does not affect the plaintiff's ownership interest, we need not address such matters definitively in this case, where no such circumstances appear." (*Grosset, supra,* 42 Cal.4th at p. 1119; see *Haro, supra,* 180 Cal.App.4th at pp. 835–837 [concluding equitable considerations permitted former shareholders to maintain derivative claims where they alleged they were wrongfully deprived of their shares through a scheme to force them out by imposing assessments on them and declaring their shares forfeited when they refused to pay].)

As we have discussed, *Sirott* held this continuous ownership requirement also applies to derivative claims asserted on behalf of limited liability companies. (*Sirott, supra,* 78 Cal.App.5th at pp. 381–382 [to pursue a derivative claim, a member in a limited liability company must not only possess contemporaneous membership but must also be able to establish continuous membership].)

Section 17709.02, subdivision (a)(1)(A)–(E) permits a court, in its discretion, to excuse the *contemporaneous* ownership requirement after considering the applicability of five enumerated factors: "(A) There is a strong prima facie case in favor of the claim asserted on behalf of the limited

23

liability company. [¶] (B) No other similar action has been or is likely to be instituted. [¶] (C) The plaintiff acquired the interest before there was disclosure to the public or to the plaintiff of the wrongdoing of which plaintiff complains. [¶] (D) Unless the action can be maintained, the defendant may retain a gain derived from defendant's willful breach of a fiduciary duty. [¶] (E) The requested relief will not result in unjust enrichment of the limited liability company or any member of the limited liability company." (See *Sirott, supra*, 78 Cal.App.5th at pp. 383–385.) We held in *Sirott* these provisions pertain specifically to the *contemporaneous* ownership requirement and not the *continuous* ownership requirement. (*Id.* at p. 384.)

However, we additionally held in *Sirott*, citing *Grosset* and *Haro*, that equitable considerations may excuse the *continuous* ownership requirement where "a plaintiff is being wrongfully deprived of, or not actually losing, its interest in the corporation." (*Sirott, supra*, 78 Cal.App.5th at p. 385.)

***Standards of Review***

"A moving defendant establishes an entitlement to summary judgment by showing that the action is barred by a ' "complete defense" ' [citation], or that ' "one or more elements of the cause of action . . . cannot be established" by the plaintiff.' " (*Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1217.) Thus, generally, " 'a summary judgment motion raises only questions of law, [and] we review the supporting and opposing papers independently to determine whether there is a triable issue as to any material fact. [Citations.] In doing so, we apply the same analysis required of the trial court. "First, we identify the issues framed by the pleadings. . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. . . . [¶] . . . [T]he third and final step is to determine whether the

24

opposition demonstrates the existence of a triable, material factual issue. [Citation.]" [Citation.] Where there is sufficient legal ground to support the granting of the motion, the order will be upheld regardless of the grounds relied upon by the trial court.' " (*Ibid.*)

In this case, however, the crux of defendants' motion for summary judgment was that plaintiffs lacked standing to pursue the alleged derivative claims. Often, standing is a question of law that is reviewed de novo. (*Sirott, supra,* 78 Cal.App.5th at p. 380, citing *Schrage, supra,* 69 Cal.App.5th at pp. 150–151.) However, when a court is called upon to exercise its equitable powers, as the trial court was here, we review the judgment under the abuse of discretion standard. (*Valley Crest Landscape Development, Inc. v. Mission Pools of Escondido, Inc.* (2015) 238 Cal.App.4th 468, 482 (*Valley Crest*), citing *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1256; see *Sirott,* at p. 380 [observing the abuse of discretion standard of review would apply to a trial court's exercise of discretion in excusing the contemporaneous membership requirement under § 17709.02, subd. (a)(1)].)

" ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citation.] [¶] "The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria." ' " (*Valley Crest, supra,* 238 Cal.App.4th at p. 482.) However, "[t]he scope of the trial court's discretion is limited by law governing the subject of the action taken. [Citation.] An action that transgresses the bounds of the applicable legal principles is outside the scope

of the trial court's discretion and, therefore, is deemed an abuse of discretion." (*Ibid.*)

### Misunderstanding Regarding the Nature of EBO's Standing

As a preliminary matter, we note the trial court was clearly troubled during the summary judgment proceedings by what it perceived as an attempt by the parties, and by plaintiffs in particular, to hide EBO's questionable standing. For example, the court rejected EBO's argument that the "wrongful conduct" providing an equitable basis for EBO to continue as the derivative plaintiff was the defendants' " 'subsequent challenge of EBO's standing to maintain the derivative action' "—because it implied, said the court, that "the No Prejudice Agreement was an agreement to decline to raise the issue of standing to the Court." Since "lack of standing is jurisdictional" and "cannot be conferred (or withdrawn) merely by parties' agreement," the court concluded "raising the issue of standing, alone, [was] not evidence of wrongdoing." Indeed, at the hearing on the summary judgment motion, the court opined *Haro* was not implicated on the facts at hand because "the only fraud you're talking about is a supposedly fraudulent agreement to defraud the jurisdiction of the Court."

We see no evidence, however, the parties entered into the No Prejudice Agreement in order to subvert the fundamental jurisdiction of the court. To the contrary, as defendants, themselves, maintained, the No Prejudice Agreement memorializes that a dispute had arisen regarding whether the 50 percent membership interest in Taylor Holdings was owned by EBO or EBMOH, leading to the pending reformation action, and thus the agreement was entered into so the parties could "move forward with the vesting of title to the [medical building] in the names of the Sirott Trustees, Robles, Patel,

and Ganey, as tenants-in-common . . . without prejudicing any of their rights, defenses and interests in conjunction with [this pending litigation]."

Indeed, much earlier in the litigation—well before standing was an issue and before our holding in *Sirott*—EBO's attorneys observed in correspondence with defense counsel, "[Y]ou know that the [No Prejudice Agreement] was entered into at your request. By its terms it demonstrates that its purpose was to permit the transfers of interests by the parties to enable and facilitate the sale, while not influencing the trial on the Reformation action. In short, you did not want us to use the transfers of interest from EBO to Dr. Patel and Dr. Ganey to prove EBO was the member of . . . Taylor LLC." Thus, nothing in the record suggests any party executed the No Prejudice Agreement to obscure a possible lack of standing.

More importantly, the trial court was mistaken in assuming that because standing is "jurisdictional" (see *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 438), EBO was foreclosed from relying on assurances made by an opposing party as evidence that supports an equitable exception to the continuous ownership requirement. " '[T]he term "jurisdiction" has "many different meanings." ' . . . 'A lack of fundamental jurisdiction is " ' "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." ' " ' [Citations.] Because a lack of fundamental jurisdiction implicates 'the basic power of a court to act,' courts must enforce jurisdictional limitations even if considerations of waiver, estoppel, consent, or forfeiture might otherwise excuse a party's failure to comply with them." (*Law Finance Group, LLC v. Key* (2023) 14 Cal.5th 932, 949–950.) Indeed, "[b]ecause of those harsh consequences, we apply a 'presumption that statutes do not limit the courts' fundamental jurisdiction absent a clear indication of legislative intent to do

27

so.' [Citations.] This approach reflects ' "a preference for the resolution of litigation and the underlying conflicts on their merits by the judiciary." ' " (*Id.* at p. 950.)

There is no indication in the language of section 17709.02 that the contemporaneous and continuous ownership requirements for derivative suits were intended to be jurisdictional in the fundamental sense. To the contrary, the statute expressly allows excusing the contemporaneous ownership requirement on certain grounds in a court's discretion. And while it is silent with respect to excusing the continuous membership requirement, the courts have construed the statute to also permit excusing that requirement where equitable considerations are present. (*Sirott, supra,* 78 Cal.App.5th at p. 385.)

Thus, as we see it, the "jurisdictional" nature of standing in this context is akin to the "jurisdictional" nature of statutes of limitations or other statutory deadlines, most of which are subject to equitable exceptions such as equitable tolling and equitable estoppel. (See, e.g., *City of Salinas v. Workers' Compensation Appeals Board* (2025) 113 Cal.App.5th 801, 808 [concluding the timeframe for the grant or denial of a petition for reconsideration before the Worker's Compensation Board did not implicate the Board's fundamental jurisdiction, allowing for the possibility of equitable tolling in certain circumstances], rev. granted Nov. 15, 2025, S293212.) The same is true of the two statutory requirements a plaintiff must ordinarily meet to pursue a derivative claim on behalf of a limited liability company—both can be excused where there is an equitable basis for doing so.

We are therefore concerned that the trial court's apparent misapprehension as to the "jurisdictional" nature of EBO's standing kept it from fully considering the equities at play when determining whether an

28

equitable basis for excusing the continuous ownership requirement exists here.  However, whether this concern, alone, would dictate reversal of the summary judgment is not a question we need to answer.  Even putting this concern aside, the trial court committed legal error in granting defendants' motion, requiring reversal of the judgment.

***The Trial Court Committed Legal Error in Granting Summary Judgment***

The trial court granted the defendants' summary judgment motion on the ground EBO presented no evidence that Sirott did not intend to abide by his obligations under the No Prejudice Agreement at the time he executed it.  In other words, EBO presented no evidence raising a triable issue of promissory fraud, and the court was of the view that only evidence of that sort could raise a triable issue that EBO should be allowed to continue to prosecute the derivative claims on behalf of Taylor Holdings.

It certainly is true that an equitable exception to the continuous ownership requirement would have been established had Sirott induced EBO to distribute its membership interest in Taylor LLC to its members by entering into the No Prejudice Agreement without ever intending to honor it.  But this is clearly not the only way an equitable basis for excusing the continuous ownership requirement can be established.  As our high court stated in *Grosset,* equitable considerations may exist if "the merger is merely a reorganization that does not affect the plaintiff's ownership interest." (*Grosset*, *supra*, 42 Cal.4th at p. 1119.)  The court also stated an exception may exist if "the merger itself is *used* to wrongfully deprive the plaintiff of standing" (*ibid.*, italics added), arguably a broader standard than outright fraud.  In short, the trial court's overly narrow view of what evidence can

support equitable relief from the continuous ownership requirement was legal error, constituting an abuse of discretion.

***The Record Conclusively Establishes that EBO is Equitably Excused from the Continuous Ownership Requirement***

We further conclude the record here compels the conclusion EBO should be equitably excused from the continuous ownership requirement. In this regard, we first address arguments by the defendants concerning the significance of the No Prejudice Agreement and the scope of equitable considerations under *Grosset*, and thereafter turn to the record evidence.

### *Preliminary Issues*

#### *No Prejudice Agreement*

In their briefing, defendants assert that in the unpublished portion of our decision in *Sirott I*, we held the No Prejudice Agreement "provides no basis for establishing wrongful conduct by Defendants unless EBO can adduce 'cognizable evidence that defendants engineered the EBO distribution agreement [under which EBO relinquished its Taylor membership interest] to gain a wrongful advantage in this case' " and that this is the law of the case. Defendants again misstate our prior opinion.

In the section of *Sirott* cited by defendants, we considered whether plaintiffs' claim that the doctrines of equitable estoppel or unclean hands precluded defendants from challenging EBO's standing. We concluded plaintiffs had forfeited these issues by not raising them in the trial court, as they involved questions of fact. We went on to state that, even if we were to consider these claims, the record then before us was "insufficient to demonstrate that either equitable estoppel or unclean hands applies." Even assuming defendants breached the No Prejudice Agreement by challenging EBO's standing, we explained that plaintiffs failed to establish the requisite

30

elements for either equitable estoppel or unclean hands. We added that we could not conclude *unclean hands* applied absent "cognizable evidence that defendants engineered the EBO [D]istribution [A]greement to gain a wrongful advantage in this case." The instant appeal does not concern either equitable estoppel or unclean hands.

Defendants also assert in their briefing that the No Prejudice Agreement does not cover the EBO Distribution Agreement because, by its terms, it only applies to "instruments or agreements pertaining to a conveyance of the Property"–i.e., the medical building. This is incorrect. As we have recited, the No Prejudice Agreement states it is being entered into so the parties can "move forward with the vesting of title to the [medical building] in the names of the Sirott Trustees, Robles, Patel, and Ganey, as tenants-in-common . . . without prejudicing any of their rights, defenses and interests in conjunction with [this pending litigation]." To this end, it provides, as is relevant here, that the Taylor Distribution Agreement, and "*any other instruments or agreements pertaining to a conveyance of the [medical building]* (the 'Related Agreements'), will not prejudice any Party with respect to any claims or defenses such Party may have (or claim to have) in conjunction with [this litigation]." (Italics added.)

Under its plain terms, the EBO Distribution Agreement is a " 'Related Agreement[]' " for purposes of The No Prejudice Agreement. The EBO Distribution Agreement states it was created because the members of Taylor Holdings and the members of EBO "determined" that it was in their "individual and collective best interests" to distribute 25 percent undivided interests in the medical building to Sirott, Patel, Ganey, and Robles in order to establish a tenancy in common relationship among the four men with respect to ownership of the building. In other words, it was an agreement

31

"pertaining to a conveyance of the [medical building]." Moreover, despite Sirott's earlier declaration to the contrary (which he subsequently admitted was in error), Sirott and Robles were fully aware of the EBO Distribution Agreement at the time the medical building was transferred out of Taylor LLC to the four doctors, as they had both signed consents to the EBO Distribution Agreement and the effectiveness of that agreement was expressly contingent upon the execution of those consents. Indeed, the Taylor Distribution Agreement, which transferred the medical building out of Taylor Holdings to the four doctors, was expressly contingent upon "adoption by EBO and its members of the EBO Distribution Agreement." Thus, under the terms of all the related agreements, the conveyance of the medical building would not have occurred without the EBO Distribution Agreement.

The No Prejudice Agreement goes on to state that the "TIC Agreement, the Disclaimer Agreement, and any Related Agreements are hereby incorporated into this Agreement by reference for *purposes of specifically defining what is the subject matter of this Agreement.*" (Italics added.) Thus, under any reasonable reading, EBO understood that by executing the EBO Distribution Agreement and all of the other agreements pertaining to the transfer of the medical building, defendants agreed that the transfers effected by the EBO Distribution Agreement would not prejudice EBO "with respect to any claims or defenses . . . in conjunction with [this litigation]."

### *No Repudiation of* Grosset

At oral argument, defense counsel argued that concluding EBO is, on this record, equitably excused from the continuous ownership requirement, would eviscerate the holding of *Grosset* that shareholders lose standing to pursue derivative claims on behalf of a corporation when they no longer own

32

stock in the company.  Counsel urged that *Grosset*'s disapproval of *Gaillard v. Natomas Co.* (1985) 173 Cal.App.3d 410 (*Gaillard*), and the high court's subsequent holding in *Turner v. Victoria* (2023) 15 Cal.5th 99 (*Turner*) both make clear any exception to this "brightline" rule should be extremely limited.  Counsel reads more into the court's discussions than is warranted.

Grosset announced its holding as follows: "[W]e hold that California law, like Delaware law, *generally* requires a plaintiff in a shareholder's derivative suit to maintain continuous stock ownership throughout the pendency of the litigation.  Under this rule, a derivative plaintiff who *ceases to be a stockholder* by reason of a merger *ordinarily* loses standing to continue the litigation." (*Grosset, supra,* 42 Cal.4th at p. 1119, italics added.)  The high court then dropped a footnote stating *Galliard* was "disapproved to the extent it is inconsistent with the views expressed herein." (*Id.* at p. 1119, fn. 16.)

In *Galliard*, a shareholder of Natomas Company, a for-profit public corporation governed by the General Corporation Law (GCL), filed suit challenging "golden parachute" agreements and other benefits provided to certain officers and directors shortly before the company merged with another corporation. (*Gaillard, supra*, 173 Cal.App.3d at p. 413.)  As a result, the shareholder was required to exchange her stock in Natomas for stock in the third corporation that resulted from the merger. (*Grosset, supra*, 42 Cal.4th at p. 1112.)  *Galliard* held that the stockholder had standing to proceed with her derivative action because the relevant statute required only contemporaneous ownership and ownership at the time suit was filed. (*Grosset*, at p. 1113.)

In short, *Grosset* disapproved of *Galliard*, not because the high court wanted to limit the scope of the possible "equitable considerations" it

33

announced in *Grosset*, but because *Galliard* was the only appellate opinion that had squarely held a plaintiff is *not* required to maintain continuous stock ownership in order to pursue a derivative action in California under the GCL. (*Grosset, supra,* 42 Cal.4th at pp. 1111–1113.) Indeed, given the Court of Appeal's holding in *Galliard* that there is *no* continuous ownership requirement, the appellate court obviously did not discuss the scope of any equitable exceptions to such a requirement. Thus, *Grosset*'s disapproval of *Galliard* in no way illuminates the high court's recognition in *Grosset* that "equitable considerations may warrant an exception to the continuous ownership requirement if the merger itself is used to wrongfully deprive the plaintiff of standing, or if the merger is merely a reorganization that does not affect the plaintiff's ownership interest." (*Grosset*, at p. 1119.)

Nor does *Turner, supra*, 15 Cal.5th 99, carry the import defendants claim. In that case, the Supreme Court addressed the "director enforcement" provisions of the Nonprofit Corporation Law and, specifically, their application in the context of a nonprofit public benefit corporation. (*Id.* at pp. 108, 112.) Notably, such corporations have no shareholders (rather, they may, but are not required to, have "members"), and they are prohibited from making distributions to either directors or members. (Corp. Code, §§ 5310, 5410; see *Turner*, at p. 112.) The Nonprofit Corporation Law uniquely permits directors to sue to enforce the statutory duties incumbent upon directors of such nonprofit corporations. (Corp. Code, §§ 5231, 5233, 5142.) The issue before the high court was whether a director of a nonprofit public benefit corporation loses standing to pursue a director enforcement action for breach of a charitable trust if the director loses their position after filing suit. (*Turner* at p. 108.)

34

The court concluded there is no "continuous directorship requirement" in the nonprofit context analogous to the continuous membership requirement for shareholder derivative actions. (*Turner, supra*, 15 Cal.5th at p. 108.) In reaching this conclusion, the high court considered the pertinent statutory text, its surrounding context, the legislative history, and the overarching purpose of the director enforcement statutes. (*Id.* at pp. 108, 114–123.) Indeed, it observed, " '[s]tanding rules for statutes *must be viewed in light of the intent of the Legislature and the purpose of the enactment.*' " (*Id.* at p. 119, italics added.)

In the course of its analysis, the Supreme Court repeatedly distinguished *Grosset,* citing significant differences between the GCL provisions pertaining to shareholder derivative actions it construed in *Grosset* and the Nonprofit Corporation Law provisions pertaining to nonprofit public benefit corporations before the court in *Turner.* (*Turner, supra*, 15 Cal.5th at pp. 115, 125.) It explained, for example, how directors of nonprofit charitable organizations are materially different from the shareholders of for-profit corporations because, unlike such shareholders, directors of nonprofits have little to no financial interest in the charitable organization. (*Id.* at p. 126.) Accordingly, their connection to the charity and interest in its well-being are not solely tied to monetary concerns or their formal status as directors. Thus, should they lose their position as a director, it cannot be said that they become " ' "plaintiff[s] with absolutely no 'dog in the hunt.' " ' " (*Ibid.,* quoting *Grosset, supra*, 42 Cal.4th at p. 1114.) "Furthermore, unlike for-profit corporations, charitable organizations do not have shareholders with ownership interests in the charity. This means . . . the responsibility of directors 'to assure the integrity of the charity's activities' is heightened." (*Turner,* at p. 126.) For these reasons, among others, our high court

concluded the rule of automatic disqualification upon loss of status as a shareholder should not apply at all in the context of director actions in public benefit corporations. (*Id.* at p. 108, 134.)

The court also considered and rejected the defendants' suggestion that it adopt a continuous directorship requirement but allow "equitable exceptions from the requirement . . . when a plaintiff 'alleges with particularity facts showing [the director] was ousted in bad faith to block the litigation.'" (*Turner, supra,* 15 Cal.5th at p. 132.) In doing so, it quoted the language of *Grosset* we have repeatedly quoted here. (*Ibid.*) But the high court did not—indeed, it had no cause to—discuss the scope of equitable exceptions permissible under *Grosset's* general language, let alone, constrict the scope of such exceptions.

One of the arguments made in *Turner* to try to persuade the court to adopt a "default" continuous directorship requirement subject to exceptions was that charitable organizations would otherwise be subject to "vexatious litigation" draining their resources. (*Turner, supra,* 15 Cal.5th at pp. 132–133.) Defendants raised "the specter that without a continuous directorship requirement, a director who 'just quit,' or voluntarily disassociates from a nonprofit public benefit corporation, can continue harassing the organization through litigation." (*Id.* at p. 133.) The *Turner* court disagreed: "There is no reason to believe that suits filed by fiduciaries become meritless as soon as the plaintiffs lose their affiliations with the nonprofit organizations, or that they are maintained thereafter purely out of improper motives." (*Ibid.*) And in any case, the court saw no reason why "the possibility that some directors may quit" was a reason to make a continuous directorship requirement "the default rule." (*Ibid.*) *Turner* supported this reasoning through an "accord" citation to *Grosset* with a parenthetical stating, "the circumstances by which

a stockholder loses his shares—and specifically whether that loss is voluntary—does not matter when determining whether a continuous stock ownership requirement is appropriate." (*Id.* at p. 134.) The analogy is clear. In *Grossett*, it did not matter for purposes of *adopting* the default rule whether the stock transfer was voluntary or involuntary because they both create the same problem—loss of any dog in the hunt. Similarly, *Turner* stated it does not matter for purposes of *not* adopting such a default rule in the context of director enforcement actions because even former directors may continue to be interested in the welfare of the charitable organization and therefore are likely to continue to have a dog in the hunt. And in that regard, it does not matter if a director is forced out or quits. Contrary to defendants' assertion, none of this has any bearing on the scope of the equitable considerations that may, under *Grosset*, warrant relaxation of the continuous ownership requirement in a particular shareholder derivative case.

It bears repeating what we are not holding here. We are not declaring open season on the rule articulated in *Grosset* that California law "*generally* requires a plaintiff in a shareholder's derivative suit to maintain continuous stock ownership throughout the pendency of the litigation." (*Grosset, supra,* 42 Cal.4th at p. 1119, italics added.) Clearly, EBO no longer met that requirement when it ceased to have a membership interest in Taylor Holdings following the reorganization prior to the sale of the medical building. Nor are we opining that the No Prejudice Agreement was or is an enforceable agreement or was even a particularly good idea. We are also not overly concerned with who let the cat out of the bag first with respect to the existence and substance of that agreement. Rather, we need only determine whether, on this unique record, EBO falls within the equitable exception to

37

the general rule as articulated by *Grosset*. In doing so, we are focused on the trajectory of this specific litigation and the equities of this decidedly unusual situation. The question is whether those equities call for EBO to be allowed to continue prosecuting its derivative claims despite the loss of its membership interest in Taylor LLC. We conclude that they do.

### The Parties' Ownership Interests

Specifically, we agree with EBO that what happened here was effectively a reorganization which kept the same interested parties involved in Taylor Holdings, from the time of the challenged lease decision throughout this litigation. As we have recited, following execution of the EBO Distribution Agreement, EBO, itself, was no longer a member of Taylor Holdings. However, before the distribution, Patel and Ganey each had an indirect 25 percent interest in Taylor Holdings—through EBO, an entity they completely controlled—and after the distribution they each had a direct 25 percent interest. Whether or not Patel and Ganey's indirect interest in EBO legally could be characterized as a beneficial interest is not the issue. The salient point is that this is not the type of merger or reorganization which the continuous ownership requirement was put in place to avoid.

As explained in *Grosset,* the continuous ownership requirement "stems from the recognition that, ordinarily, the decision to pursue a claim on behalf of a corporation is entrusted to the board of directors as within the ambit of its authority to manage the corporation's affairs." (*Grosset, supra*, 42 Cal.4th at p. 1109.) "The rationale for permitting a shareholder to maintain a derivative suit on a corporation's behalf, and thereby intrude upon a board's authority, is that his or her 'status as a shareholder provides an interest and incentive to obtain legal redress for the benefit of the corporation.' [Citation.] But '[o]nce the derivative plaintiff ceases to be a stockholder in the

corporation on whose behalf the suit was brought, [they] no longer [have] a financial interest in any recovery pursued for the benefit of the corporation.' " (*Ibid.*) "As one court put it, allowing a plaintiff to retain standing despite the loss of stock ownership would produce 'the anomalous result that a plaintiff with absolutely no "dog in the hunt" is permitted to pursue a right of action that belongs solely to the corporation.' " (*Id.* at p. 1114; accord, *id.* at p. 1118 ["To ensure that the corporation's interests are adequately represented, the derivative plaintiff must maintain a proprietary interest in the corporation sufficient to motivate the plaintiff 'to engage in a zealous prosecution.' "].)

Here, not only do Patel and Ganey indisputably have a "dog in the hunt," they have an *identical* dog in the hunt—i.e., collectively a 50 percent interest in Taylor Holdings and individually a 50 percent interest in EBO. And if this record shows us anything, it is that all potential plaintiffs (EBO, Patel, and Ganey) have been, and continue to be, highly motivated to zealously prosecute this matter to the end, and for the exact same reasons, and in the exact same way. In short, the reorganization—from EBO to Patel and Ganey—had zero significance in terms of who effectively owned, and actually participated in, the limited liability company. For purposes of who can appropriately prosecute a derivative claim, it is a distinction without a difference. Thus, the circumstances that occurred here are wholly unlike those that occur in the larger corporate environment, where loss of shares generally means loss of interest in the economic wellbeing of the company. (Compare *Turner*, *supra*, 15 Cal.5th at p. 126 [concluding that when nonprofit directors lose their position as a director it cannot be said that they become plaintiffs with absolutely no dog in the hunt].)[8]

---

[8]  We are not, through this reasoning, attempting to somehow resurrect Patel and Ganey as individual plaintiffs in this matter.  Rather, we are

39

Moreover, in *Sirott*, we observed "not 'all laws that apply to corporations also apply to LLCs,' " but concluded plaintiffs had failed to "identify any distinction between the two types of business entities that would support different interpretations of essentially the same language." (*Sirott*, *supra*, 78 Cal.App.5th at p. 383.) While this was true for purposes of the statutory interpretation question with which we were then tasked, we are now considering a different question and certainly there are differences between for-profit corporations and limited liability companies which can support relaxation of the continuous ownership requirement under an equitable analysis.

As mentioned above, a limited liability company " ' "provides members with limited liability to the same extent enjoyed by corporate shareholders [citation], but permits the members to actively participate in the management and control of the company." ' " (*Sirott*, *supra*, 78 Cal.App.5th at p. 381; see generally § 17701.01 et seq.) Thus, as Patel declared, "I am one of two equal members of EBO. Dr. Ganey is the other member. EBO is a single purpose entity, which was formed to hold our interest in . . . Taylor LLC. I am, and have always been, the manager of EBO." Patel was also, during all relevant timeframes, a manager of Taylor Holdings. In other words, *throughout* this litigation, Patel has consistently had an interest in the wellbeing of Taylor, either as a manager of both EBO and Taylor Holdings, or as a member and manager of Taylor. (Compare *Turner*, *supra*, 15 Cal.5th at p. 128 [noting that " '[c]haritable-nonprofit boards are typically self-perpetuating' and 'quite limited in size.' Given the insularity of these

---

simply noting that the interconnectedness between EBO, Patel, and Ganey in this context tips the equities in favor of allowing *EBO* to continue as the *derivative* plaintiff.

boards and the fact that 'some portion of the board will be defendants' in cases alleging breach of charitable trusts or fiduciary duties, 'it is typical for a member of the board who brings a derivative suit to lose her position on the board.' Moreover, unlike in matters involving for-profit companies where if a shareholder loses standing to bring a derivative suit, 'another one of the many otherwise similarly situated people who own shares can easily step in to fill the role,' charities cannot rely on such easy availability of directors to substitute in as a plaintiff."].)

In addition, while we held in *Sirott* that the statutory discretion conferred on trial courts under section 11709.02, subdivision (a)(1)—which permits courts to excuse a former member from the *contemporaneous* membership requirement—does not permit a court to excuse a former member from the *continuous* ownership requirement (*Sirott, supra,* 78 Cal.App.5th at pp. 376–377, 384–385), in the context of a smaller limited liability company, many of these statutorily enumerated factors may also be present and weigh in favor of equitable relaxation of the continuous ownership requirement in a particular case. They do so here.

For instance, given the limited number of players involved in this litigation, it is clear that "[n]o other similar action has been or is likely to be instituted." (§ 17709.02, subd. (a)(1)(B).) It is also true that, "[u]nless the action can be maintained, [Sirott] may retain a gain derived from [his] willful breach of a fiduciary duty," and the "requested relief will not result in unjust enrichment of the limited liability company or any member of the limited liability company." (*Id.,* subd. (a)(1)(D) & (E).) Finally, EBO acquired its interest before there was disclosure to the public or to EBO of the wrongdoing of which EBO complains. (*Id.,* subd. (a)(1)(C).) Thus, this is unquestionably not a situation where Patel and Ganey obtained direct membership interests

in Taylor Holdings during the litigation for " 'purely litigious motives' " or to " 'attack transactions' " occurring before the reorganization. (See *Grosset*, *supra*, 42 Cal.4th at p. 1109.) And, importantly, an injustice may occur should EBO not be allowed to continue as a derivative plaintiff.

We agree with both parties that the sale of the medical building could have been structured so that EBO remained a member of Taylor Holdings. But we cannot fault EBO, Patel, and Ganey for making the decision they did in this context—both because there was no California decision extending the continuous ownership requirement to limited liability companies until our decision in *Sirott* and because they reasonably relied on the plain language of the No Prejudice Agreement that the transactions they undertook in connection with the transfer of the medical building for sale would not prejudice them in this litigation. Adding to this " 'the policy of deciding cases on their merits' " (*Haro*, *supra*, 180 Cal.App.4th at p. 837), we have no difficulty concluding the reorganization here was of a kind creating equitable considerations calling for EBO to be excused from the continuous ownership requirement.

### *Additional Equitable Considerations Support Excusing EBO from the Continuous Ownership Requirement*

While we do not believe they are necessary to our decision, additional considerations support our conclusion that equity calls out for EBO to be permitted to continue as a derivative plaintiff in this case. As we observed in *Sirott*, *Grosset* stated a continuous membership exception may also exist if "the merger itself is *used* to wrongfully deprive the plaintiff of standing." (*Grosset*, *supra*, 42 Cal.4th at p. 1119, italics added.)

"Used" in this context is arguably broader than "caused to happen." Indeed, *Haro* allowed former shareholders of a corporation to maintain a

42

derivative suit where they were "deprived wrongfully of standing" by being subjected to a discriminatory and excessive assessment, even though they "voluntarily" gave up their shares rather than pay the assessment. (*Haro, supra,* 180 Cal.App.4th at p. 836.)

We reject defendants' assertion that "wrongfully deprived" as used in *Grosset* narrowly means only those situations "where the merger itself is the subject of a claim of fraud, perpetrated merely to deprive shareholders of the standing to bring a derivative action." (See *Grosset, supra,* 42 Cal.4th at p. 1110, citing Delaware law.) While clearly aware that Delaware law is so limited, our Supreme Court made no mention of such a limitation when describing the equitable considerations that can trigger an exception to the continuous ownership requirement under California law. Rather, the court chose to use more expansive language, allowing an exception where a reorganization was "used to wrongfully deprive the plaintiff of standing." (*Id.* at p. 1119.)

Thus, even if Sirott entered into the No Prejudice Agreement simply to protect his own interests in the pending reformation action, he executed a clear and broadly worded agreement which EBO, Patel, and Ganey understandably relied on in structuring the sale of the medical building as they did. Sirott then *used* that agreement, repeatedly, in an attempt to deprive EBO of standing. Specifically, despite being fully aware of the actions EBO, Patel, and Ganey took in connection with the sale of the medical building and notwithstanding his promise that "no prejudice" would result with respect to the parties' claims and defenses in this litigation, Sirott subsequently demurred to the third amended complaint on standing grounds, opposed EBO's motion for standing, filed a writ petition in this court challenging the trial court's conclusion that EBO could continue as a

43

derivative plaintiff, and finally vigorously objected on remand, and continues to object, to EBO retaining standing on equitable grounds.

In sum, given the unique circumstances of this case, we conclude equity compels relaxation of the continuous ownership requirement, allowing EBO to proceed with derivative claims that have now been pending for nearly a decade.[9] We express no opinion as to how the merits of this litigation should finally be decided. Given our disposition, we also reverse the fee and costs order, while again expressing no opinion as to how those matters should be resolved at the conclusion of the litigation.

## DISPOSITION

The judgment in No. A169638 is reversed and the matter remanded for further proceedings consistent with this opinion. Because we are reversing the trial court's judgment in No. A169638, we necessarily also reverse its subsequent order on attorney fees and costs in No. A171754. EBO is entitled to its costs on appeal.

---

[9] As a final matter, we reject defendants' assertion that EBO waived any challenge to the adverse ruling on its declaratory relief cause of action by failing to separately discuss it on appeal. In granting summary judgment, the trial court stated EBO was "not entitled to an equitable exception to the continuous ownership requirement and lacks standing to bring its *claims* in the Fifth Amended Complaint." (Italics added.) Thus, it lumped the remaining claims together and granted summary judgment based on reasoning we have concluded was erroneous.

_____

Banke, Acting P. J.

We concur:

_____

Langhorne Wilson, J.

_____

Smiley, J.

A169638 & A171754; *EBO Properties North LLC v. Sirott & Patel et al v.*

*Sirott et al*